Margaux A. Savee (SBN 244767)
msavee@polsinelli.com
Teri H.P. Nguyen (SBN 267498)
thpnguyen@polsinelli.com
POLSINELLI LLP
Three Embarcadero Center, Suite 2400
San Francisco, California 94111
Telephone:   415.248.2100
Facsimile:    415.248.2101

Brett Charhon (*Admitted Pro Hac Vice*)
bcharhon@ccrglaw.com
Steven Callahan (*Admitted Pro Hac Vice*)
scallahan@ccrglaw.com
Anthony M. Garza (*Admitted Pro Hac Vice*)
agarza@ccrglaw.com
CHARHON CALLAHAN
ROBSON & GARZA, PLLC
3333 Lee Parkway, Suite 460
Dallas, Texas 75219
Telephone:   214.521.6400
Facsimile:    214.764.8392

Counsel for Defendant
CLOUDFLARE, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| SWARMIFY, INC., a Delaware corporation, <br><br>       Plaintiff, <br><br>  v. <br><br> CLOUDFLARE, INC., a Delaware corporation, <br><br>       Defendant. | CASE NO. 3:17-cv-06957-WHA <br><br> **CLOUDFLARE, INC.'S RESPONSE TO SWARMIFY, INC.'S MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date: February 15, 2018 <br> Time: 8:00 a.m. <br> Place: Courtroom 12, 19th Floor <br> Judge: Hon. William H. Alsup <br><br> Action Filed: December 6, 2017 <br> Trial Date: None Set |

**[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]**

# **TABLE OF CONTENTS**

I.  Introduction ........................................................................................................ 1

II.  Factual Background.......................................................................................... 1

    A.  The Parties .............................................................................................. 1

    B.  Swarmify and Cloudflare Discuss Business Opportunities and Sign an NDA ............ 3

    C.  The Parties Went Their Separate Ways After Cloudflare
        Declined to Purchase Swarmify For ███████ ........................................ 3

    D.  Swarmify's Alleged Trade Secret ........................................................... 4

        1.  Video-Streaming Fundamentals ................................................... 5

        2.  ████████████—Swarmify's Purported Advance.................... 7

        3.  ████████████—the Narrower Accused Functionality ............... 8

    E.  Swarmify's "Secret" Was Known to Cloudflare, Pre-NDA ..................... 9

        1.  Cloudflare's Pre-NDA Invention Disclosure Form ........................ 9

        2.  Pre-NDA Conversations .............................................................. 11

    F.  Cloudflare's Team Did Not Use Swarmify's "Confidential" Information ................. 11

    G.  Swarmify's Trade Secret and Accused Functionality Are Publicly Known.............. 12

        1.  Academic Papers and Patents....................................................... 12

        2.  HolaCDN ..................................................................................... 13

        3.  Other Competitors ....................................................................... 13

        4.  Swarmify Itself Publicly Disclosed ████████ ......................... 14

    H.  Cloudflare's Blog Posts and Swarmify's Ill-Advised Lawsuit .................... 15

III.  Preliminary Injunction Standard ..................................................................... 16

IV.  Elements of Swarmify's Causes of Action........................................................ 17

V.  The Court Should Deny Swarmify's Motion .................................................... 18

    A.  Swarmify Will Not Succeed On the Merits ........................................... 18

        1.  Cloudflare Developed its Video Product Independently of Swarmify ........... 19

        2.  Swarmify's Alleged Secret is in the Public Domain...................... 19

        3.  Swarmify Cannot Monopolize Basic Economics........................... 20

4. Mr. Barnett's Testimony Is Not Credible.........................................................20

B. Swarmify is Not Likely to Suffer Irreparable
Harm in the Absence of Preliminary Relief ................................................23

C. The Balance of Equities Favors Cloudflare .................................................25

D. The Public Interest Favors Cloudflare ........................................................25

VI. Conclusion...........................................................................................................25

`

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adv. Cardiovascular Sys., Inc. v. Medtronic, Inc.*,
    95-CV-03577, 2008 WL 4647384 (N.D. Cal. Oct. 20, 2008).................................... 24

*Buschman v. Anesthesia Bus. Consultants LLC*,
    42 F. Supp. 3d 1244, 1250 (N.D. Cal. 2014) .......................................... 17

*DNA Genotek Inc. v. Spectrum Sols. L.L.C.*,
    16-CV-1544, 2016 WL 8738225 (S.D. Cal. Oct. 6, 2016) ................................ 25

*DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*,
    176 Cal. App. 4th 697 (2009) ......................................................... 23

*Eros Tours & Travel, Inc. v. Infinitywaves, LLC*,
    14-CV-5095, 2015 WL 11457691 (C.D. Cal. Feb. 9, 2015)................................ 24

*Flextronics Int'l, Ltd. v. Parametric Tech., Corp.*,
    13-CV-0034, 2013 WL 5200175 (N.D. Cal. Sept. 16, 2013) .............................. 23

*Goldie's Bookstore, Inc. v. Superior Ct.*,
    739 F.2d 466 (9th Cir. 1984).......................................................... 23

*Imax Corp. v. Cinema Techs., Inc.*,
    152 F.3d 1161 (9th Cir. 1998).......................................................... 20

*KS Healthline, LLC v. GN Healthcare Corp.*,
    16-CV-02807, 2016 WL 9343164 (D. Ariz. Oct. 4, 2016).................................. 24

*Logansport Mach. Co., Inc. v. Neidlein-Spannzeuge GmbH*,
    12-CV-233, 2012 WL 1877854 (N.D. Ind. May 22, 2012) ................................ 24

*Lopez v. Brewer*,
    680 F.3d 1068 (9th Cir. 2012).......................................................... 16

*MAI Sys. Corp. v. Peak Computer, Inc.*,
    991 F.2d 511 (9th Cir. 1993)........................................................... 17

*Munaf v. Geren*,
    553 U.S. 674 (2008) .................................................................. 16

*Qualcomm Inc. v. Compal Elecs., Inc.*,
    17-CV-01010, 2017 WL 3967289 (S.D. Cal. Sept. 7, 2017)............................... 23

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984) .................................................................. 17

*SRI Int'l v. Acoustic Imaging Techs. Corp.*,
    92-CV-5015, 1993 WL 356896 (N.D. Cal. Sept. 3, 1993) ....................................................... 25

*United Tactical Sys., LLC v. Real Action Paintball, Inc.*,
    14-CV-04050, 2014 WL 6788310 (N.D. Cal. Dec. 2, 2014) .................................................. 17

*Veronica Foods Co. v. Ecklin*,
    16-CV-07223, 2017 WL 2806706 (N.D. Cal. June 29, 2017) .................................................. 17

*Wang v. Golf Tailor, LLC*,
    No. 17-CV-00898, 2017 WL 2861111 (N.D. Cal. July 5, 2017) ........................................... 17

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................................................................... 16, 23

STATUTES

18 U.S.C. § 1836 ............................................................................................................................... 16

18 U.S.C. § 1839 ............................................................................................................................... 17

Cal. Civ. Code § 3426.1 ............................................................................................................... 16, 17

Cal. Civ. Code § 3426.2(a) .............................................................................................................. 16

# I.      INTRODUCTION

In an effort to support its claim that it has a protectable trade secret, and that it is entitled to the extraordinary remedy of a preliminary injunction, Swarmify claims a trade secret of staggering scope, ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████ But the accused functionality is clear, and quite narrow—███████████████████████████ This functionality is no secret, and is thus not owned by Swarmify. As shown below, the evidence conclusively demonstrates that Cloudflare's engineers independently thought ████████████████████████████████ ████████████████████████████████████ This same technique is disclosed in publicly available academic papers and patents, and has been marketed to the public by Swarmify's competitors. Because Swarmify has no evidence of a trade secret used by Cloudflare, Swarmify cannot demonstrate a likelihood of success on the merits.

Swarmify likewise cannot establish irreparable harm. Despite Swarmify's conclusory assertions, monetary damages would compensate Swarmify for any harm it alleges it has suffered. In fact, Swarmify already offered to sell the very trade secret alleged in this case, along with the rest of the company's assets, to Cloudflare for ████. This fact alone demonstrates that monetary damages would make Swarmify whole.

Finally, both the balance of equities and the public interest weigh in favor of denying Swarmify's motion. A temporary injunction would serve only to harm Cloudflare and its customers by preventing Cloudflare's new video-streaming product from hitting the market, and the public interest favors robust competition.

Because Swarmify cannot meet any of the four preliminary-injunction factors, the Court should deny the motion.

# II.     FACTUAL BACKGROUND

## A.      The Parties

Founded in 2009, Cloudflare is a San Francisco-based web-performance and security company helping to build a better internet. Its technology speeds up and protects millions of websites

and other properties connected to the internet. Cloudflare powers more than 1.5 trillion page views per month (which is nearly 10 percent of all internet requests) for more than 2.5 billion people worldwide. Cloudflare has over 500 employees, and its major investors include Microsoft, Google and Fidelity. *See* Rao Decl. ¶ 3.

Before meeting Swarmify, Cloudflare had been providing (and continues to provide) internet-related services to Cloudflare's customers. As explained in more detail in the Declaration of Nitin Rao, Cloudflare provides reverse-proxy services through a worldwide network of data centers, accessible via anycast addressing. Rao Decl. ¶¶ 4-11.

Swarmify is a ███████ company based in Melbourne, Florida. *See* Original Compl. ¶ 6; Barnett Decl., Ex. I (Slide 16 "Team"). Over the years, ████████████████████████████████████████████████████████████████████████████████████████████████. Barnett Decl., Ex. I (Slide 16 "Team"). When Swarmify approached Cloudflare,[1] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Ex. 34 (Barnett Tr.) at 11:2-4, 95:6-18.

---

[1] Contrary to Swarmify's claim (*see* Mot. at 9; Barnett Decl. ¶ 17), Cloudflare did *not* approach Swarmify. Instead, on February 29, 2016, Swarmify's Nathan Barnett approached one of Cloudflare's founders (Michelle Zatlyn) after she gave a presentation at Startup Grind. *See* Ex. 3. After Mr. Barnett's contact, Ms. Zatlyn placed Mr. Barnett in touch with Cloudflare's Dane Knecht because Mr. Barnett indicated that he wished to discuss "CloudFlare Apps and see if we might be a fit for offering video to [Cloudflare's] customers through that program." *Id.*

[2] The exhibits to this Response are attached to the Declarations of Dane Knecht (Exhibits 1-4), Nitin Rao (Exhibits 5-17), Samuel Coates (Exhibit 18-24), Dr. Michael Zink (Exhibits 25-33), and Anthony M. Garza (Exhibits 34-48).

**B.    Swarmify and Cloudflare Discuss Business Opportunities and Sign an NDA**

After Swarmify approached Cloudflare in February 2016, the parties began discussing Swarmify's technology and a potential deal between the companies, which led to the NDA, executed on April 22, 2016. *See* Ex. 18. Cloudflare routinely enters into NDAs when evaluating potential business deals with other companies and for a variety of other purposes.[3] Knecht Decl. ¶ 14.

While Mr. Barnett claims that ███████████████████████████████████████████ ████████████████████████[4] in reality, the NDA only protects information that is truly confidential. The NDA does *not* protect information (i) in the public domain, Ex. 18, ¶ 1(a)-(b); (ii) known to Cloudflare before signing the NDA, or from other sources, *id.* ¶ 1(c)-(d); (iii) developed "independently" by Cloudflare "without reference to any information communicated to [Cloudflare] by [Swarmify]," *id.* ¶ 1(e); or (iv) communicated by Swarmify free of any obligation of confidence, *id.* ¶ 1(f). Cloudflare is always free to use such information and technology.

**C.    The Parties Went Their Separate Ways After Cloudflare Declined to Purchase Swarmify For ██████**

Under the NDA, Swarmify disclosed a handful of materials—███████████████████ ██████████████████████████████—to Cloudflare in April 2016 and May 2017. Rao Decl. ¶ 18; Barnett Decl., Exs. B-C; *see also* Ex. 34 (Barnett Tr.) at 49:9-12, 130:22-131:4. Cloudflare advised Swarmify on May 11, 2016, that Cloudflare would ████████████████ ██████████████████████████ Ex. 13.

Swarmify then re-approached Cloudflare at the end of April 2017. Ex. 4. Because Cloudflare was then interested in hiring Systems Engineers, on May 31, 2017, Cloudflare extended employment offers to Swarmify's Nathan Barnett and Chris Fung. Ex. 16; Ex. 17. The employment offers were not accepted. Barnett Decl., Ex. E.

Instead, on June 12, 2017, Swarmify offered to sell all of its assets—including ████ ██████████████████████████—to Cloudflare for ██████. Barnett Decl., Ex. D; Ex. 34 (Bar-

---

[3]    Of course, when Cloudflare wishes to acquire technology, it either licenses or purchases the technology, purchases the relevant company, or builds the technology itself. For example, Cloudflare recently acquired StopTheHacker, Eager, and Neumob. *See* Ex. 24 (listing acquisitions).

[4]    *See* Ex. 34 (Barnett Tr.) at 62:25-63:18.

nett Tr.) at 91:18-92:8; 93:5-93:18.

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] [5]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] [6]

**D.    Swarmify's Alleged Trade Secret**

In its motion, Swarmify identifies its alleged trade secret, "without limitation," as:

[REDACTED]

---

[5]    As demonstrated by Cloudflare's CEO's e-mail, Swarmify's allegation (Mot. at 8-9) that Cloudflare [REDACTED] is not correct.

[6]    Additionally, Swarmify [REDACTED] *Compare* Ex. 34 (Barnett Tr.) at 28:20-29:15 *with* Knecht Decl. ¶¶ 16, 21. [REDACTED] Knecht Decl. ¶ 21; Barnett Decl., Ex. E (Cloudflare advising that [REDACTED]

[REDACTED]

Mot. at 5-6. Swarmify defines this entire paragraph as its "Technology," and then states that "**For a more thorough description** of the Technology misappropriated by Cloudflare, *see* Exhibits H & I to the declaration of Nathan Barnett." Mot. at 6 n.1 (emphasis added). Swarmify resorts to "security by obscurity"—it refuses (or is unable) to crisply identify its allegedly unique creation, its innovation, its "secret," to frustrate Cloudflare's ability to refute its claims.

Cloudflare will prove that Swarmify's technology, while ill-defined, is not secret. In this section, Cloudflare (i) reviews video-streaming fundamentals, [REDACTED]

[REDACTED] While Swarmify claims large swathes of technology, whether the Court focuses on what Swarmify might broadly claim as new [REDACTED] or the narrower accused functionality [REDACTED], the result is the same—Cloudflare will prove (in later sections of the brief) that the alleged "secret" was previously developed by Cloudflare, disclosed by competitors, and found in the public domain.

### 1. Video-Streaming Fundamentals

**Internet Video Streaming.** Generally, when large video files are "streamed" on the internet, a video player does not download a large, complete video file before playing the video. Rather, large video files are pre-processed and split into small video chunks (or segments) that are often two to five seconds long. When an internet user requests to play a video file, the responding server provides a "manifest" file that tells the player the location of all of the short video chunks that comprise the video. The manifest file can list IP addresses (or URLs) for the various video chunks that make up the video. The video player for the internet user sequentially downloads and plays the video chunks, using the manifest to determine the server location to use to request each discrete video

chunk. If done properly, the sequential downloading and playing of the two-second chunks is invisible to the lay user viewing the video. *See* Knecht Decl. ¶ 6; Zink Decl. ¶¶ 8-9.

**Adaptive Video Streaming.** In the early 2000s, video providers started implementing "adaptive" streaming—video players with logic that could "adapt" to varying bandwidth conditions. Like prior video streaming, videos are still pre-processed into video chunks, and stored on a server for sequential download by the player. But *alternative versions* of each video chunk are created— smaller, easily downloaded chunks that are of lower bitrates and lower quality, and larger chunks suitable for higher bandwidths that are of higher bitrates and higher quality. When streaming a video, the video player continually evaluates the bandwidth conditions between the player and the server, and uses the state of the bandwidth to decide which video chunk to download and play. If the bandwidth conditions are relatively good, the player chooses to download larger, high-bandwidth chunks from the server, and provides a relatively high-quality video stream. If, bandwidth conditions deteriorate, however, the player chooses lower-quality video chunks that the player can download and play without stalling the video. *See* Zink Decl. ¶¶ 10-11; ███████████████ ███████████████████████████████████████████ Ex. 34 (Barnett Tr.) at 51:5-6.

**Scalable Video Streaming.** Since at least 2012, video providers have implemented "scalable," or "distributed" adaptive streaming. Zink Decl. ¶ 14. Scalable adaptive streaming adds one more feature—the alternative versions of the video chunks are located on more than one server for download, and the system not only has to decide which video chunk to download (as with traditional adaptive streaming), but also must decide which server to download the video chunk from. Zink Decl. ¶ 13. For example, in 2012, a researcher found that Netflix used more than one content delivery network (or CDN, a company that provides servers that can host video files), and that Netflix's players would switch from one CDN to another, during the middle of a video stream, when the performance of the first CDN deteriorated. Zink Decl. ¶ 14; Ex. 27. Other academic papers and patents discuss the use of multiple servers to host videos, and various algorithms to use to decide which server(s) to use. Zink Decl. ¶¶ 17, 21-22; Exs. 28-29, 32-33. Further, Swarmify's website publicly discloses ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████



1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ██████████████; Ex. 45 (screenshot of demo).[7]

4     2. ████████████—Swarmify's Purported Advance

Returning to Swarmify's "Technology," the Court should conclude that the first part of Swarmify's claimed "secret" (as described in its motion) ████████████████

████████████████████████████████████████████████████

Mot. at 5-6. █████████████████████████████. *See* Ex. 45.

Continuing through the "Technology," Swarmify is left with its purported improvement to known, fundamental techniques:

████████████████████████████████████████████████████

█████████████████████████████████. Mot. at 6.[8] Swarmify characterizes this as

████████████████████████████████████████████████████

---

[7] The Court may use the demo by visiting www.swarmify.com/SwarmifyDemo/speed/. After the video starts playing, the Court can monitor, in real time, (i) the measured bandwidth of two video sources (CDN A and CDN B), and (ii) the "Amount [of video] served by CDN A" and the amount served by CDN B. ████████████████████████

[8] *See also* Mot. at 20 ████████████████████



Id.; *see also* Barnett Decl. ¶ 5; Almeroth Decl. ¶¶ 31-36, 44-48, 51; Ex. 34 (Barnett Tr.) at 84:3-9

The patent application

." Mot. at 14 (emphasis added).

3.　　　　　　　　　　—the Narrower Accused Functionality

Swarmify's complained-of functionality is narrower still. Swarmify claims that Cloudflare uses Swarmify's trade secret because

Mot. at 14. The allegation is repeated in Mr. Barnett's declaration and communications. Barnett Decl. ¶ 42; *see also* Ex. 19

* * * * *

As shown, the only potential **trade secret** that Swarmify claims, over core video-streaming functionality,

9

CLOUDFLARE'S RESPONSE TO SWARMIFY'S
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:17-CV-06957-WHA

*See also* Ex. 34 (Barnett Tr.) at 84:3-9 ███; 90:24-91:6 (same); 74:4-19 ███

### E. Swarmify's "Secret" Was Known to Cloudflare, Pre-NDA

#### 1. Cloudflare's Pre-NDA Invention Disclosure Form

As noted above, the parties signed the NDA on April 22, 2016. Ex 18 at 1. But before then, Cloudflare's Dane Knecht had already realized that Cloudflare could save money by serving video from underused servers, and documented his ideas in an Invention Disclosure Form. *See* Ex. 1. As explained below, Cloudflare's wholesale-bandwidth contracts provided Mr. Knecht with the motivation to ███

To understand Mr. Knecht's motivation, Cloudflare briefly explains its wholesale-bandwidth contracts. Cloudflare is a content delivery network, and uses high amounts of bandwidth all around the world. Cloudflare must pay to use bandwidth, and strives to lower its bandwidth costs. Rao Decl. ¶¶ 12-13, Exs. 7-8. With that aim, Cloudflare buys bandwidth from the wholesale market. *See* Ex. 7. Under these wholesale-bandwidth contracts, Cloudflare does not pay for each byte of data that passes through a bandwidth provider. Rather, it pays for the "size of the pipe"—i.e., the price is based on the 95th percentile of utilization in any given month. *See* Rao Decl. ¶¶ 12-13; Exs. 7-8. As a result, if a wholesale bandwidth provider is "off peak" (i.e., at a level lower than the 95% percentile of utilization), Cloudflare can direct traffic through that provider for no additional cost. *See* Knecht Decl. ¶ 5; Ex. 8. Cloudflare is alert to opportunities to take advantage of its underused, cheaper bandwidth provided by its wholesale-bandwidth contracts. Rao Decl. ¶ 13.

Mr. Knecht's IDF-85 is dated September 30, 2015, and was printed on April 4, 2016, before Cloudflare signed the NDA. Ex. 1. In the IDF, Mr. Knecht notes that, when an internet user requests a video, Cloudflare can serve the initial video chunks quickly through nearby data centers, and then, after the video has started, serve the remaining video chunks in a more cost-efficient manner by us-

ing different data centers that are cheaper or have more capacity (under Cloudflare's wholesale-bandwidth contracts). The IDF first states that:

> In the case of video we could serve first few seconds (or lower quality seek video segments) at every colo and rest of video from cheapest colos or ones with capacity).

Ex. 1. As explained by Mr. Knecht, this means that, when a user initially asks for a video, Cloudflare initially directs the user to "every colo"[10]—Cloudflare relies on anycast addressing and internet protocols to find a close, fast server, without explicitly considering cost or peak usage. Knecht Decl. ¶ 8. But after providing the beginning of the video, Cloudflare would instead direct the user to download further video chunks from a server that had a lower monetary cost to use, or a server with spare transit capacity. *Id.*

The second paragraph of the IDF explains the idea in a bit more detail:

> When a video loads in a browsers use anycast initially to load the video from the closest location based on BGP or based on DNS redirection. The web player can calculate based on the speed and bit rate of video how much it needs to buffer to ensure that the user can play without future buffering and pull from an alternate location that might have cheaper transit costs. The player would need to account for a user fast forwarding and then switching back to the fastest location.

Ex. 1. Mr. Knecht again explains that, initially, the video uses anycast addressing to find the "closest" data center, so that the connection is fast. Knecht Decl. ¶ 9. As explained in the second sentence, Mr. Knecht then directs the user to an alternate server to download the remaining portions of the video, if a cheaper solution is found. *Id.* ███████████ ███████████ The third sentence notes that the system should consider dynamically switching the source back from the "cheaper" location to the "faster" location if the player suddenly needs data quickly (such as when a user fast forwards a video). *Id.* ¶¶ 9-10. ████████████████████████ ████████████████

These paragraphs of the IDF, along with the others examined in more detail in Mr. Knecht's declaration (Knecht Decl. ¶¶ 10-12) show that Mr. Knecht ██████████████ █████████████████████████████

---

[10] "Colo" is another term used at Cloudflare to refer to data centers. Rao Decl. ¶ 8.

1 ████████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████ *Id.* ¶ 13.

3 Under the NDA, Swarmify cannot prevent Cloudflare from using technology conceived before April

4 22, 2016. Ex. 18, NDA ¶ 4(c), (e).

5         2. <u>Pre-NDA Conversations</u>

6       Additionally, before signing the NDA, Mr. Barnett had already told Mr. Knecht about

7 Swarmify's practice of ██████████████████████. Attached as Exhibit 2 is

8 the transcript of an electronic chat between two Cloudflare employees (Mr. Knecht and John Gra-

9 ham-Cumming), from ten days before Cloudflare signed the NDA. Knecht Decl. ¶ 6. At that point,

10 Mr. Knecht told Mr. Graham-Cumming (and thus already knew) that Swarmify was ██████

11 ████████████████████████████████ *Id.* ¶ 18. In other words, Cloud-

12 flare already knew, free from any requirement of confidentiality, that Swarmify was ████████

13 ████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████

15 ██████████████. *Id.*

16     **F.**    **Cloudflare's Team Did Not Use Swarmify's "Confidential" Information**

17       Cloudflare did not use any Swarmify secrets or confidential information when building its

18 video product. Knecht Decl. ¶¶ 24-26; Rao Decl. ¶ 21. The video-product effort was led by Mr.

19 Knecht, who had received Swarmify's ████████ but Mr. Knecht was not involved in the

20 day-to-day execution of the product or coding involved with the project. Knecht Decl. ¶ 24. The ex-

21 ecution of the product is entrusted to another engineer, Oliver Yu, and his team of Renan Dincer,

22 Jesse Kipp, and Preston Pham. Rao Decl. ¶¶ 19-20; Knecht Decl. ¶ 24. Mr. Rao and Mr. Knecht did

23 not send any of Swarmify's documents (including its ████████████████ or

24 confidential information to Mr. Yu or his team. Rao Decl. ¶ 21; Knecht Decl. ¶ 25. Mr. Knecht has

25 provided a declaration stating that "Cloudflare developed its video-streaming technology inde-

26 pendently of Swarmify and without reference to any information communicated to Cloudflare by

27 Swarmify that is subject to the NDA." Knecht Decl. ¶ 26.

28

### G. Swarmify's Trade Secret and Accused Functionality Are Publicly Known

As shown below, ████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
are shown in academic papers and patents, known by competitors, and disclosed by Swarmify.

#### 1. Academic Papers and Patents

Dr. Michael Zink, an Associate Professor at the University of Massachusetts at Amherst, has distilled the content of certain public academic papers and patents. His declaration shows that:

- Adaptive-bitrate streaming and scalable adaptive streaming are known and understood by those in the art. *See* Zink Decl. ¶¶ 10-14.

- The 2012 Adhikari paper discloses that Netflix's video player switches video sources, from one cache to another cache, in the middle of a video, if the measured downloaded bandwidth is below a specific threshold. *Id.* ¶ 14; Ex. 27 at 1624.

- The 2015 Zhang paper discloses (i) a video-streaming system that stores video segments on multiple servers, and (ii) logic and algorithms implemented by the system to maximize various factors and results. Zink Decl. ¶ 17; Ex. 28 at 6854.

- The 2016 Bouton paper recognizes that a multi-server video-streaming environment requires logic to select an appropriate server, and suggests a probability-based server-selection strategy, used while the video is being streamed, that depends on the state of the video buffer. Zink Decl. ¶ 17; Ex. 29 at 1, 8, Figs. 1-2.

- The 2012 Krishnan paper shows that an increase in startup delay for video playback results in users abandoning the video-streaming service. Zink Decl. ¶ 18, Ex. 30 at 2-3.

- The 1999 Sen paper proposed streaming from different servers (a fast proxy server, followed by a different, more distant server) to reduce the initial delay in starting a video. Zink Decl. ¶ 19; Ex. 31 at 1310-11.

- U.S. Patent No. 9,113,183 to Lemmons, entitled "Selecting a Media Content Source Based on Monetary Cost," discloses a video system that uses monetary cost as a factor in determining which server to download video content from, and that can switch servers in the middle of video playback. Zink Decl. ¶ 21; Ex. 32 at cols. 1, 3, 10, 15.

- U.S. Patent No. 8,169,916 to Pai, entitled "Multi-Platform Video Delivery Configuration," discloses a system that chooses between servers, for video delivery, based on the "lowest cost of delivery of the video chunks." Zink Decl. ¶ 22; Ex. 33 at cols. 1, 2, 4.

Dr. Zink opines that it is well known to ████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

[REDACTED] *Id.* ¶ 24.

### 2. HolaCDN

A competitor company, HolaCDN, publicly advertises and sells the allegedly secret, [REDACTED] In HolaCDN's FAQ, the company explains how it initially streams video chunks from fast servers, and then streams video chunks from lower-cost servers:

> The HolaCDN client performs mid-stream switching to optimize for cost and quality. **Video is initially streamed from the closest/fastest server** - usually from a HolaCDN fast start server. **Once it is safe to do so, video is streamed from one or more HolaCDN low cost servers that can provide optimal quality.** This results in reduced delivery costs with same or better performance compared to traditional CDNs.

Ex. 35 at 36 (emphasis added). Another portion of the FAQ describes the "Fast Start" servers and the "low cost" servers in more detail, and promises "[f]ast start times, with low overall delivery cost." *Id.* at 29-30. HolaCDN also discloses a solution that considers both cost and performance when selecting the "right" CDN for video playback:

> [T]he HolaCDN JS client dynamically decides where to send traffic to. The switching decision is calculated every 100ms, and is optimal per each end-user. **When the video starts, the JS client will select the fastest available source, irrespective of cost. Once the video is playing and a sufficient buffer is available, the JS client will select the lowest cost video source which will ensure smooth viewing experience with no buffering.** In case the probability of buffering increases, the JS client will revert to one of the faster CDNs, irrespective of cost.

*Id.* at 37. HolaCDN also discloses [REDACTED] (*id.* at 5-6, 9-10, 12, 16, 29) on its main webpage (Ex. 36, "Starts streaming from fastest nearby server and continues streaming from lower-traffic servers"), and in a public slide deck (Ex. 37 at slide 8 ("Fast start from high end Local Servers[,] Continue in Idle Geos[,] Utilize redundant[,] Low-cost servers[,] Optimize with cheap Locations[.]")). Fast-to-cheap switching of video sources is industry-known functionality, and is not owned by Swarmify.

### 3. Other Competitors

Other companies [REDACTED]

- The company Streamroot sells dynamically switched, multi-sourced video-delivery services. Its website states that "Dynamic multi-sourcing of content means less rebuffering and higher bitrates." Ex. 38 at 2. "Streamroot DNA$^{TM}$ dynamically selects the best source for the next fragment." *Id.* Streamroot's "technology is built on innovative delivery techniques that dynamically determine the best source for each fragment of video." *Id.* at 4.

- Streamroot's blog includes a 2015 post addressing multi-CDN solutions, noting that "[i]t is now common for providers to be able to switch between CDNs/clouds mid-stream, which is a significant advance for both quality of service and price." Ex. 39 at 3. The blog acknowledges that software provided by the company Cedexis "allows the CDN to be switched according [to] customer parameters: time of day . . . cost-based volume optimization, client device bitrate, and more." *Id.*

- The company NS1 has issued a white paper explaining how users can "optimize a multi-CDN architecture" by selecting a CDN based on a user's geography, the real-time performance of the CDN, and "business metrics." Ex. 40 at 5. For example, the paper notes that "[t]raffic can be steered toward or away from a particular CDN, depending on usage commits or impending overages." *Id.* (showing a filter chain that considers location, cost, and performance when choosing a CDN for a particular video).

Thus, at least Streamroot and NS1, in addition to HolaCDN, offer ███████████████
██████████████████████████████████████████████

4.    Swarmify Itself Publicly Disclosed ████████████████

Even Swarmify itself has disclosed ██████████████████████████████.

**Media and Mobile Expo.** In 2015, Mr. Barnett presented his software at Plug and Play's Media and Mobile Expo.[11] *See* Ex. 43 (video recording, also available at https://www.youtube.com/watch?v=N99XqXcwhpM); ████████████████████. Cloudflare has attached a transcript of a portion of the presentation (between 1:04-2:49) as Exhibit 44. Mr. Barnett discloses that Swarmify put "intelligence into the player," and allows the "player software [to] collaborate with the network and move the video around pathways that aren't congested." Exs. 43-44. (the player "notices that there's congestion and starts delivering around that congestion point"). Mr. Barnett also discloses the use of underused servers to reduce cost: "We are also able to reduce the cost by half because we are better able to utilize the network links that are underused or

---

[11]    At deposition, Mr. Barnett initially claimed ██████████████████████████
████████████████████████ Ex. 34 (Barnett Tr.) at 125:2-16.

aren't used at all currently." *Id.* Thus, Mr. Barnett discloses reducing ████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

**Podcast.** Two years ago, Mr. Barnett spoke on a podcast titled "Swarmify: Cure video buffering." Ex. 41 (audio recording, also available at https://player.fm/series/groundswell-startups/swarmify-cure-video-buffering); Ex. 34 (Barnett Tr.) at 107:20-108:2. Cloudflare has attached a transcript of a portion of the interview (between 3:08 and 5:02) as Exhibit 42. In that interview, Mr. Barnett characterizes current video-streaming services as using a "single kind of connection," near to the user, to deliver video. Exs. 41-42. He notes a key problem with the single-stream approach—it is fragile, and leads to interruptions in service. His disclosed solution is to "eliminat[e] single points of failure," by using "multiple paths" and "multiple servers," and "mov[ing] logic into the player." *Id.* He states that "by adding resiliency and reliability into the player we are also able to reduce costs for the media company who is streaming the video." *Id.* In short, Mr. Barnett discloses

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

### H.    Cloudflare's Blog Posts and Swarmify's Ill-Advised Lawsuit

On September 27, 2017, Cloudflare published two blog posts about its video-streaming technology. Barnett Decl., Ex. J, Ex. K. The portion of the blog posts that Swarmify takes issue with

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████ Mot. at 14; Barnett Decl. ¶ 42 █████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

On October 3, 2017, Swarmify's Nathan Barnett sent Cloudflare an e-mail accusing Cloudflare of disclosing Swarmify's alleged "secret sauce" in the blog posts through ████████████

████████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████ Ex. 19. Cloudflare promptly responded in an October 6, 2017 e-mail indicating that, although Swarmify's claim was dubious, Cloudflare would investigate. Ex. 20. Despite this, Swarmify filed this lawsuit on December 6, 2017. ECF No. 1. The very next day, Swarmify issued a press release about the lawsuit—curiously, the press release specifically tells the world that Swarmify's alleged trade secret is posted on Cloudflare's blog. *See* Ex. 21 ("The court filing alleges that Cloudflare disclosed [Swarmify's] proprietary techniques on the Cloudflare blog[.]").

Even in the face of the lawsuit and press release, Cloudflare still desired to demonstrate to Swarmify that Cloudflare had not taken any of Swarmify's alleged trade secrets. To that end, on December 8, 2017, Cloudflare advised Swarmify that it had "gathered evidence that definitively demonstrates that Cloudflare's technology at issue was conceived PRIOR to meeting Swarmify—for instance, the first IDF was documented in writing in September 2015, well before Swarmify shared any information with us of any kind." Ex. 22. Cloudflare further indicated that it wished to give "Swarmify comfort that <u>Cloudflare did not in any way, shape or form use, steal or misappropriate *any* confidential information of Swarmify in any manner whatsoever.</u>" *Id.* (emphasis in original). Rather than take Cloudflare up on its offer to disclose Cloudflare's IDF, Swarmify proceeded to serve its lawsuit on December 14, 2017 and, on December 22, 2017 (i.e., the Friday before Christmas), filed its motion requesting a temporary injunction. ECF Nos. 19-20.[12]

## III.    PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation and quotations omitted); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Because it is an extraordinary remedy, a preliminary injunction will only issue "upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. To obtain a preliminary injunction, Swarmify must establish four ele-

---

[12]    During Mr. Barnett's deposition, he claimed for the first time that ████████████████████ ████████████████████████████████ Ex. 34 (Barnett Tr.) at 30:9-31:20. Because this allegation is not in the motion, Cloudflare does not address it here, but nevertheless ████████████████ ████████████████████████ Ex. 46.

ments: (i) that it is likely to succeed on the merits; (ii) that it is likely to suffer irreparable harm in the absence of preliminary relief; (iii) that the balance of equities tips in its favor; and (iv) that an injunction is in the public interest. *Winter*, 555 U.S. at 20. Swarmify, as the movant, must carry its burden by a "clear showing." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

## IV.   ELEMENTS OF SWARMIFY'S CAUSES OF ACTION

Swarmify only moves for a preliminary injunction based on its trade-secret misappropriation and breach-of-contract claims. Mot. at 16, 21.

**Trade Secret Misappropriation.** To prevail on its trade-secret claims, Swarmify must prove, among other things, that (i) Swarmify owns a trade secret and (ii) Cloudflare misappropriated the trade secret (i.e., disclosed or used the trade secret via improper means). *See generally* Cal. Civ. Code §§ 3426.1, 3426.2(a) (California Uniform Trade Secrets Act); 18 U.S.C. §§ 1836(b)(3), 1839 (US Defend Trade Secrets Act). "[A] plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993).

A trade secret under California and US law is information that (i) derives "independent economic value" from "not being generally known" to the public or other persons, and (ii) is the subject of "reasonable" measures to maintain secrecy. Cal. Civ. Code § 3426.1(d); 18 U.S.C. § 1839(3). Swarmify may prove misappropriation of a trade secret by showing that (i) Cloudflare knew that it acquired the trade secret under a duty to maintain secrecy and limit its use, and (ii) nevertheless used the trade secret without consent. Cal. Civ. Code § 3426.1(b); 18 U.S.C. § 1839(5) (similar definition of "misappropriation"); *Veronica Foods Co. v. Ecklin*, 16-CV-07223, 2017 WL 2806706, at *12 (N.D. Cal. June 29, 2017) ("The CUTSA's definitions of 'trade secret,' 'misappropriation,' and 'improper use' are substantially identical to [those] in the DTSA.").

Thus, under both state and federal law, technology in the public domain, or technology independently developed by Cloudflare, is not a trade secret. *See, e.g.*, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) (industry-known information not a trade secret) *Wang v. Golf Tailor, LLC*, No. 17-CV-00898, 2017 WL 2861111, at *4 (N.D. Cal. July 5, 2017) (public information not a trade secret); *United Tactical Sys., LLC v. Real Action Paintball, Inc.*, 14-CV-04050, 2014 WL

6788310, at *22 (N.D. Cal. Dec. 2, 2014); 18 U.S.C. § 1839(6)(B) ("reverse engineering, independ-ent derivation, or any other lawful means of acquisition" does not constitute improper means); Cal. Civ. Code § 3426.1 (similar).

**Breach of Contract.** To prevail on its breach-of-contract claim, Swarmify must demonstrate four elements: "(1) the existence of a contract, (2) plaintiff's performance or excuse for nonperfor-mance, (3) defendant's breach, and (4) damages to plaintiff as a result of the breach." *Buschman v. Anesthesia Bus. Consultants LLC*, 42 F. Supp. 3d 1244, 1250 (N.D. Cal. 2014).

## V.    THE COURT SHOULD DENY SWARMIFY'S MOTION

Swarmify cannot prevail on any of the four preliminary-injunction elements.

### A.    Swarmify Will Not Succeed On the Merits

Swarmify must support its motion with evidence that Cloudflare's video-streaming product uses Swarmify's trade secrets. At his deposition, Mr. Barnett stated ███████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████. *See* Ex. 34 (Barnett Tr.) at 48:23-25, 54:7-8, 66:22-67:6, 87:6-88:13 ████████████████████████ 133:15-134:12, *see also id.* at 36:21-37:1, 38:14-20 ████████████████████████████████████████████████████████ ███████████████████████████████████ Mot. at 14, 20.

Swarmify is not likely to succeed on the merits because Cloudflare independently developed Cloudflare's streaming-video product. Further, whether the Court considers the potential "secret" as ████████████████████████████████████████████████████████ ████ As such, Cloudflare did not breach the parties' NDA, nor could the Court find Cloudflare lia-ble under state and federal trade-secret-misappropriation statutes.[13]

---

[13] Common sense dooms the motion. If Swarmify believed its technology was worth ███████ █████████████████████ Or why, having allegedly stolen Swarmify's ████████ "secret sauce," would Cloudflare immediately turn around and publish the secret on its blog for all the world to see? That would make no sense whatsoever. The only rational explanation is that Cloudflare did not steal anything, nor is Swarmify's "secret sauce" secret.

## 1. Cloudflare Developed its Video Product Independently of Swarmify

In September 2015, Mr. Knecht conceived of the idea of (i) using Cloudflare's fast anycast network to serve the initial chunks of a video, and then (ii) serving subsequent video chunks from off-peak servers, to take advantage of Cloudflare's wholesale-bandwidth contracts. *See* Knecht Decl. ¶¶ 3-9, 11-13; Ex. 1, IDF-85. Mr. Knecht also disclosed dynamically switching back to Cloudflare's fast anycast network if the player determines that fast data delivery should be prioritized, such as when a user fast-forwards a video. Knecht Decl. ¶¶ 9-10; Ex. 1, IDF-85. Swarmify cannot prevent Cloudflare from implementing ██████████████████████████—Cloudflare's own ideas that pre-date the NDA. Ex. 18, NDA, ¶ 1(c), (e).

Further, Swarmify has no basis to controvert Mr. Knecht's sworn statements that the team developing the video product did not use Swarmify's allegedly confidential materials. Knecht Decl. ¶ 26. Cloudflare's independent development of its video product defeats Swarmify's trade-secret claim and its breach-of-contract claim. *See* Section IV, above.

## 2. Swarmify's Alleged Secret is in the Public Domain

███████████████████████████████████████████

████████████████████████████████████

• ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████.

- HolaCDN publicly ██████████████████ "When the video starts, the JS client will select the fastest available source, irrespective of cost. Once the video is playing and a sufficient buffer is available, the JS client will select the lowest cost video source which will ensure smooth viewing experience with no buffering." Ex. 35 at 37.

- Streamroot's blog shows that dynamically switching CDNs, mid-stream, based on customer parameters is "common" (Ex. 39 at 3), and Streamroot's website sells "delivery techniques that dynamically determine the best source for each fragment of video" (Ex. 38 at 4). NS1 monitors traffic conditions and the cost of competing CDNs, and can steer video traffic from one CDN to another based on both performance and cost. Ex. 40 at 5.

- In a video and podcast available online, Mr. Barnett discloses r██████████████████

███████████████████████████████████████████ Exs. 41-44.

Both "dynamic switching" and "fast-to-cheap switching" of video sources is publicly disclosed. This disclosure dooms Swarmify's claims. *See* Section IV, above.

### 3. Swarmify Cannot Monopolize Basic Economics

Stripped of rhetoric, Swarmify claims that it can prevent Cloudflare from ███████████████ ████████████████████████████████████████████. *See* Ex. 34 (Barnett Tr.) at 103:21-104:7 ████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████

But this is basic, well-known economics—once a company knows of a cheaper source for any sort of input, a company will try to take advantage of the cheaper source. Swarmify did not tell Cloudflare about cheap bandwidth from off-peak servers; the savings were baked into Cloudflare's whole-sale-bandwidth contracts. *See* Section II.E.1, above. Swarmify cannot prevent Cloudflare from employing basic economic theory to ███████████████████████████████[14]

### 4. Mr. Barnett's Testimony Is Not Credible

Finally, for the reasons below, the Court should not rely on Mr. Barnett's declaration or testimony to determine the state of the market, whether Swarmify's technology was "new," or whether Swarmify's technology was "secret." Mr. Barnett is simply not credible on these subjects.

███████████████████████████████████████████████. Mr. Barnett claims to ██████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ███████████. Barnett Decl. ¶ 9; *see also* Ex. 34 (Barnett Tr.) at 44:2-5. In fact, he claimed that Swarmify's ██████████████████████████████████████████████████████████████████ ██████████████████████████████████x. 34 (Barnett Tr.) at 12:16-18. But HolaCDN sells ███████████████████████████████████████████████████ "Video is initially streamed from the closest/fastest server - usually from a HolaCDN fast start server. Once it is safe to do so,

---

[14] *See, e.g.*, *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998) (plaintiff must describe its trade secret with "sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade").

video is streamed from one or more HolaCDN low cost servers that can provide optimal quality."
Ex. 35 at 36. And both Streamroot and NS1 offer multi-CDN solutions that allow for dynamic
switching based on performance and cost. *See* Ex. 38 at 2, 4; Ex. 39 at 3; Ex. 40 at 5. Mr. Barnett,
however, ███████████████████████████████████ Ex. 34 (Barnett Tr.) at 83:12-17 ████████
███████████████████████████████████████████████████████████████ 123:15-21 ██████████
███████████████████████████████████████████████████████████████████████████████████
███████████████████████████████ Simply put, Mr. Barnett has shown that he does
███████████████████████████████████████████████████████████████████████████████████
███████████████ *See also* Ex. 34 (Barnett Tr.) at 123:7-123:14 ████████████████████
███████████████████████████████; Ex. 47 (TOFFS webpage); Ex. 48 (Cloudinary blog post).
███████████████████████████████████████████████████████████████████████████████████
█████████████████████████ *See*, *e.g.*, Barnett Decl. ¶ 9.
██████████████████████████████████████████████████████████████████████. Mr. Barnett
claims ██████





*See* Ex. 34 (Barnett Tr.) at 112:19-113:4

[REDACTED]

[REDACTED] [15]

\* \* \* \* \*

In short, (i) Cloudflare independently developed its technology, (ii) Swarmify's "secret" [REDACTED] is in the public domain, and (iii) Swarmify cannot prevent Cloudflare from using [REDACTED] Given this, Cloudflare did not breach the parties' NDA and Cloudflare is not liable to Swarmify under the DTSA and CUTSA. *See* Section IV, above (elements of Swarmify's causes of action).

### B. Swarmify is Not Likely to Suffer Irreparable Harm in the Absence of Preliminary Relief

Even assuming it could demonstrate a likelihood of success, Swarmify could still not satisfy the irreparable harm element of the preliminary-injunction inquiry.[16] The only allegedly "irreparable" injury Swarmify claims it will suffer, absent an injunction, is conclusory and speculative— Cloudflare is (i) a "threat to Swarmify's very existence", (ii) "prevent[ing] Swarmify from effectively marketing its innovative Technology to untold numbers of potential customers," (iii) "prevent[ing] Swarmify from attracting investors",[17] and (iv) causing Swarmify to "suffer injury to its

---

[15] The conclusory testimony of Dr. Almeroth that he is [REDACTED]

[16] The fact that the NDA purports to stipulate that any breach of the NDA constitutes irreparable damage does not mean that Swarmify need not prove irreparable injury. *See, e.g., Flextronics Int'l, Ltd. v. Parametric Tech., Corp.*, 13-CV-0034, 2013 WL 5200175, at \*8 (N.D. Cal. Sept. 16, 2013) ("Contractual language alleging breach of the contract would cause irreparable harm, or that money damages would be inadequate, standing alone, is not enough to satisfy the irreparable harm requirement."); *DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*, 176 Cal. App. 4th 697 (2009) ("[A] court must reject a stipulation contemplating an equitable remedy that is contrary to law or public policy, such as where the evidence shows that an aggrieved party actually has an adequate remedy at law.").

[17] Swarmify claims that Cloudflare [REDACTED]

reputation and goodwill". Mot. at 23. Swarmify does not attempt to explain why ███████

████████████████████████████████████████████████████████████████████████████

███████████████████████. Exs. 10, 11, 12; Ex. 34 (Barnett Tr.) at 11:2-4, 95:6-18.

"[P]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in the original). "Speculative injury does not constitute irreparable injury." *Goldie's Bookstore, Inc. v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir. 1984) ("[T]he court determined that Goldie's would lose goodwill and 'untold' customers. This finding, not based on any factual allegations, appears to be speculative."). "The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended ѵ . . are not enough. The possibility that adequate compensatory or oth-er corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm." *Qualcomm Inc. v. Compal Elecs., Inc.*, 17-CV-01010, 2017 WL 3967289, at *7 (S.D. Cal. Sept. 7, 2017).

In fact, in 2015, the Central District rejected "irreparable injury" allegations substantively identical to Swarmify's. *See Eros Tours & Travel, Inc. v. Infinitywaves, LLC*, 14-CV-5095, 2015 WL 11457691, at *3 (C.D. Cal. Feb. 9, 2015) (rejecting argument that plaintiffs "are likely to suffer irreparable harm in three forms: (1) damage to goodwill; (2) harm to business reputation and market share; and (3) lost economic value of previously-confidential intellectual property" and that defend-ant threatens "the very existence of their business", because "any potential losses in goodwill and market share are likely to be fleeting and recoverable in the form of money damages"). This Court should likewise reject Swarmify's speculative allegations.

Swarmify claims to have been developing its product since 2013, and that it has spent ███

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████. Barnett Decl., Ex. D; Ex. 34 (Barnett Tr.) at 91:18-92:8, 93:5-93:18. Swarmify's offer to sell itself, and all of its assets and intel-lectual property, dooms its motion, as such offer shows that monetary damages would make

Swarmify whole. *See, e.g.*, *Logansport Mach. Co., Inc. v. Neidlein-Spannzeuge GmbH*, 12-CV-233, 2012 WL 1877854, at *11 (N.D. Ind. May 22, 2012) (where plaintiff "placed a price on its customer information," plaintiff "has essentially conceded that a particular value can be placed on its confidential information"); *Adv. Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 95-CV-03577, 2008 WL 4647384, at *10 (N.D. Cal. Oct. 20, 2008) (as a "general rule," money damages sufficient where plaintiff "has been willing to accept payment in lieu of exclusive control over the patent"); *KS Healthline, LLC v. GN Healthcare Corp.*, 16-CV-02807, 2016 WL 9343164, at *2 (D. Ariz. Oct. 4, 2016).

### C. The Balance of Equities Favors Cloudflare

Issuing a temporary injunction in this case, where Cloudflare independently developed its video-streaming product and Swarmify's alleged trade secret is publicly available, would be inequitable. It would harm (and certainly substantially delay) Cloudflare's lawful efforts to bring a new product to market and compete in the marketplace. Granting Swarmify a preliminary injunction would be inconsistent with the parties' NDA, and California and federal trade-secret statutes.

### D. The Public Interest Favors Cloudflare

The public interest favors competition. *See, e.g.*, *SRI Int'l v. Acoustic Imaging Techs. Corp.*, 92-CV-5015, 1993 WL 356896, at *4 (N.D. Cal. Sept. 3, 1993) ("[the] public interest is also served by promoting competition, free from judicial intervention that is improvident or warranted by only insubstantial grounds"); *DNA Genotek Inc. v. Spectrum Sols. L.L.C.*, 16-CV-1544, 2016 WL 8738225, at *5 (S.D. Cal. Oct. 6, 2016) As noted above (*see* Section II.F-G), Cloudflare developed its technology independently and Swarmify's alleged trade secret is in the public domain and available to anyone to use. Thus, the public interest favors Cloudflare.

## VI. CONCLUSION

For these reasons, the Court should deny the Swarmify's motion.

Dated: January 18, 2018

Respectfully submitted,

s/Steven Callahan
MARGAUX A. SAVEE (SBN 224767)
  msavee@polsinelli.com
TERI H.P. NGUYEN (SBN 267498)
  thpnguyen@polsinelli.com
**POLSINELLI LLP**
Three Embarcadero Center, Ste. 2400
San Francisco, California 94111
Telephone: (415) 248-2100
Facsimile: (415) 248-2101

BRETT CHARHON
  bcharhon@ccrglaw.com
STEVEN CALLAHAN
  scallahan@ccrglaw.com
ANTHONY M. GARZA
  agarza@ccrglaw.com
**CHARHON CALLAHAN**
**ROBSON & GARZA, PLLC**
3333 Lee Parkway, Suite 460
Dallas, Texas 75219
Telephone: (214) 521-6400
Facsimile: (214) 764-8392
Admitted *pro hac vice*

*Counsel for Defendant Cloudflare, Inc.*