1                                    **Pages 1-29**

2                   IN THE UNITED STATES DISTRICT COURT

3                  THE NORTHERN DISTRICT OF CALIFORNIA

4                BEFORE THE HONORABLE WILLIAM H. ALSUP

5

6     SWARMIFY, INC.,              )
                                   )      **File No:  17-CV-6957**
7                 Plaintiff,       )
                                   )
8     vs.                          )
                                   )
9     CLOUDFLARE, INC.,            )
                                   )      San Francisco, California
10                Defendants.      )      Thursday, February 15, 2018

11    _____

12                 <u>**MOTION FOR PRELIMINARY INJUNCTION**</u>
                             (PUBLIC SESSION)

13

14    APPEARANCES:

15

      For the Plaintiff:      Ms. Sara Spires
16                            Mr. Christopher Hodge
                              SKIERMONT DERBY
17                            Thanksgiving Tower
                              1601 Elm Street, Suite 4400
18                            Dallas, Texas   75201

19    For the Defendant:      Mr. Anthony Garza
                              Mr. Steven Callahan
20                            CHARHON CALLAHAN ROBSON & GARZA
                              3333 Lee Parkway, Suite 460
21                            Dallas, Texas   75219

22                            Ms. Margaux Savee
                              POLSINELLI LLP
23                            Three Embarcadero Center, Suite 2400
                              San Francisco, CA   94111

24

25    Reported by:  Vicki Eastvold, RMR, CRR, Official Reporter

```
 1            THE DEPUTY CLERK:  Calling civil action 17-6957
 2   Swarmify, Inc., vs. CloudFlare, Inc.
 3            Counsel please approach the podium and state your
 4   appearances for the record.
 5            THE COURT:  Good morning.
 6            MS. SPIRES:  Good morning, Your Honor.  Sarah
 7   Spires from Skiermont Derby on behalf of Swarmify.  With me
 8   today is Chris Hodge also from Skiermont Derby.  And our
 9   client Nathan Barnett from Swarmify.
10            THE COURT:  Welcome to all of you.
11            MR. GARZA:  Anthony Garza with Charhon Callahan
12   Robson & Garza for CloudFlare.  With me is my colleague
13   Steve Callahan.  Along with me is our other counsel Margaux
14   Savee from the Polsinelli firm.  We also have three lawyers
15   from CloudFlare in the audience, the general counsel Douglas
16   Kramer and two other attorneys there, Lisa Durrette and Alex
17   Griffin.
18            THE COURT:  Back there, are you two with one side
19   or the other?
20            Reporters.  Okay.  All right.  So let's see.  This
21   is a motion by Swarmify.  Please go ahead.
22            MS. SPIRES:  Your Honor, I have some slides to
23   hand up if --
24            THE COURT:  Looks like too many.  I'm not going to
25   go through all those slides.  That's an inch worth of
```

1    slides.

2            MS. SPIRES:  I don't expect you to.  I just might

3    refer to one of them.

4            THE COURT:  Give them to me but -- is all of this

5    information in the record?

6            MS. SPIRES:  Yes, Your Honor.

7            THE COURT:  Because it's an old trick.  Trick

8    number 38 is give me things in slides that are not actually

9    in the record.  So that's no good because I can't let you

10   get away with that.

11           MS. SPIRES:  My trick is that where there are

12   sometimes things under seal it can be helpful to refer to a

13   slide and it can keep me from having to actually describe it

14   --

15           THE COURT:  All right.  Well, we'll see.  As long

16   as it's all in the record you can refer to a few of these.

17   Please go ahead.

18           MS. SPIRES:  Your Honor, we're here today on a

19   preliminary injunction motion brought by Swarmify.

20           By way of background, Nathan Barnett, who is

21   behind me, cofounded Swarmify in 2013.  And between 2013 and

22   2015 Swarmify spent approximately a million dollars and

23   21,000 man hours on technology research and development that

24   was geared toward improving streaming video reliability.

25           As a result of this, Swarmify launched its product

1    in late 2015.  And since its inception, Swarmify has

2    protected the know-how behind its technology as trade

3    secrets.  In addition, on September 11, 2015, Swarmify also

4    submitted an unpublished patent application that is still

5    pending.

6            CloudFlare admits that for seven years, or since

7    2010, it's had every motivation to support video streaming.

8    In fact in its blog, which is in the record, CloudFlare

9    states that it was only a few days after launch that they

10   got their first request to support video streaming.

11           Yet until today, which was September 27 of 2017,

12   they'd avoided it.  That's not to say CloudFlare had never

13   thought about video streaming.  In fact on September 30,

14   2015, Dane Knecht of CloudFlare created an IDF, or

15   information disclosure form, entitled In Order to Provide

16   Faster Video Loads, Serve Parts of Videos From Different

17   Locations.

18           THE COURT:  Say that sentence again.  It went by

19   me too fast.  Say it more slowly.  That last sentence.

20           MS. SPIRES:  Sure.  The IDF that CloudFlare

21   created in September of 2015 was entitled In Order to

22   Provide Faster Video Load, Serve Parts of Video From

23   Different Locations.  This is Exhibit 1 to Mr. Knecht's

24   declaration in opposition to Swarmify's motion.

25           This IDF goes on to suggest that when a video

loads in a browser you can use any cast initially to load
the video from the closest location to ensure the user can
play without buffering, and then pull from an alternate
location that might have cheaper transit costs.

THE COURT: All right. Wait. Do you have a slide
that diagrams that kind of flow of data and packets like
that?

MS. SPIRES: Yes.

THE COURT: What slide could I look at here to --

MS. SPIRES: Sure. The actual IDF is on slide 28.
It's on the left-hand side. That's a screen shot of the
IDF. It's a little small possibly for reading here.

THE COURT: No, I'm talking about -- why don't you
pull over my -- I'll let you draw it. Pull over the easel,
please, and park it right about there or somewhere where I
can -- I want you to draw a diagram of the various places
that you --

Let's say you got -- let's say you got a 60-second
video. And what I want you to do is show where it
originates and then all these servers around the country
where it can be pulled up and how it gets to the final end
user and these various selection things. It was not quite
clear to me how that technology works. And I don't think
you invented that. I don't think you're claiming to have
invented it. But that's a background factor I would like to

1  understand better.

2          MS. SPIRES:  Sure.

3          THE COURT:  Can you draw it up here for me?  What

4  I want you to do -- what's your point?

5          MS. SPIRES:  Are you asking me to draw how --

6  there are, I'd say, three different aspects of the

7  technology here and I'm just trying to clarify which one.

8  So there's Swarmify's trade secret that it disclosed to

9  CloudFlare.

10         THE COURT:  I want the background.

11         MS. SPIRES:  From the IDF?

12         THE COURT:  What does IDF mean?

13         MS. SPIRES:  Basically, as by way of background,

14 Swarmify disclosed its trade secrets to CloudFlare in a

15 potential acquisition process by way of NDA, and then one

16 month after the final acquisition talks end, all of this

17 information has been disclosed, CloudFlare starts to develop

18 its own product.  Within three months has the exact same

19 solution.

20         THE COURT:  Yes.  But before your trade secret,

21 what was the prior art?  The YouTube has been around for

22 decades.

23         MS. SPIRES:  Yes.

24         THE COURT:  How did YouTube segment out its things

25 and send it over different servers?

1        MS. SPIRES:  So slide 32 may help you with this.

2   It has a comparison between the Swarmify software methods

3   and CloudFlare's IDF.

4        THE COURT:  I'm going to give you one more chance

5   then I'm going to go to the other side.  I want you to draw

6   a circle up there.  Use a dark colored thing so I can see

7   it, please.

8        Do you know what I'm asking over there?

9        MR. GARZA:  I think so, Your Honor.

10       THE COURT:  All right.  Okay.  Draw a circle up

11  there that says YouTube.

12       MS. SPIRES:  Okay.

13       THE COURT:  Or something like YouTube.  Okay?

14  Then down there at the bottom put another circle that says

15  end user.

16       MS. SPIRES:  Okay.

17       THE COURT:  Okay.  Then in between going across

18  horizontally draw five small circles.

19       MS. SPIRES:  Okay.

20       THE COURT:  Exactly.  Okay.  Now, the image that's

21  coming through the paperwork to me -- and I could be way off

22  base -- that's why I'm trying to make sure I understand --

23  is that the existing technology before your company ever

24  existed already segmented out a given video, and any given

25  segment would be available on let's say five different

1      sources.  And you could somehow have a choice of which of

2      the five.

3               So is that right?  Or is this something that came

4      along -- help me understand that development.

5               MS. SPIRES:  It's right that you could have a

6      choice among the five.  It's how the user could choose.

7               THE COURT:  So okay.  I want to understand that

8      how you -- not how to choose yet, but how -- why would --

9      here's what I don't understand:

10              Okay.  So let's say you downloaded segment number

11      -- let's say you divide a 60-second thing into ten segments,

12      each of which are six seconds long.  And then -- so to me

13      it's crazy that you have all ten segments taking up space on

14      five different servers.  To me that is overuse of the

15      system.  You don't need it to be on five different servers.

16              But that's the image that I'm getting from your

17      paperwork, is that the system is so inefficient that every

18      video that goes out through America gets sent through

19      multiple channels and it's available through multiple

20      channels, and all that space is being taken up through

21      multiple channels.  And yet in the end there's only one

22      channel is going to be selected for that particular segment.

23      Do you see?  That's what -- can it really be that

24      inefficient?  Can the system really be that dumb?

25              So I'm missing something.  I'm missing something

1    and I want somebody who actually understands the technology

2    to explain it to me.  No, not you.  It has to be in the

3    record.  Do you understand it or not?

4         MS. SPIRES:  In terms of whether it exists on how

5    many different servers, that really isn't the technology.

6         THE COURT:  What?

7         MS. SPIRES:  Whether this video exists on multiple

8    servers isn't really what's at issue here.

9         THE COURT:  No.  That's what you're -- okay.

10   That's what it sounds like.  Why is there a choice then?  If

11   there's a choice you're saying it's available out there on

12   five different servers, to take this example.

13         Do you understand what I'm getting at?

14         MR. GARZA:  I think so, Your Honor.

15         THE COURT:  All right.  I'm going to -- don't go

16   away.  I want to get your take on it.  Maybe that will help

17   me, and then we'll come back to the plaintiff's side.  I'm

18   trying to understand the prior art now.  I'm not trying to

19   understand the trade secret.  I want to understand how it

20   worked before the plaintiff ever even came along.

21         MR. GARZA:  Do you mind if I use the Elmo?

22         THE COURT:  Can't you use my diagram?

23         MR. GARZA:  Sure.

24         THE COURT:  Use my diagram.  Use the diagram right

25   there.  Come on.  Help me out here.

1          MR. GARZA:  So the question I know you're

2     interested in is why these video segments are on five

3     different servers like you said.

4          THE COURT:  Yeah.

5          MR. GARZA:  Before I get there, let me tell you

6     the adaptive streaming prior art.  And we can move from

7     there to the first generation, which I think is what you're

8     thinking.  Even a second generation --

9          (NOTE:  Microphone being repositioned.)

10         MR. GARZA:  So initially these video bits, what

11    happens if you get a big video file, an MP4, you send it

12    through an encoder.  What the encoder does is split

13    everything up into a lot of segments, like you said -- six

14    different or ten different six-second segments -- but it

15    also splits up into different segments based on quality.  So

16    there are low quality segments and there are high quality

17    segments.

18         What happens, YouTube encodes the videos.  Big E

19    for encoder here.

20         THE COURT:  Why would you use something that

21    light?  Come on.  I can't see that.  Use a big, black magic

22    marker.

23         MR. GARZA:  Encoder.  All right.  YouTube has a

24    video, goes to the encoder, turns into lots of video

25    segments.

1    THE COURT:  Okay.  But each of those is a

2    different segment?  Or you're saying each of those is the

3    very same segment but different qualities?

4    MR. GARZA:  So -- yeah.  It's the second one.  So

5    each six-second segment of video -- and it can be two

6    seconds, it can be ten seconds -- you have different levels

7    of quality for each six-second segment.

8    So if you have a high bandwidth situation, you

9    grab the best quality you can.  You go for the HD version of

10   the video clip.  If the user figures out that it has low

11   bandwidth, it will instead ask for the low quality clip

12   because that's what can be handled.

13   Does that part of it make sense?

14   THE COURT:  Well, but under that -- this is what

15   YouTube actually does?  Is that what you're telling me?

16   MR. GARZA:  This is industry standard adaptive

17   streaming.  Of tech --

18   THE COURT:  This is before the plaintiff.

19   MR. GARZA:  Correct.  This is adaptive streaming

20   as --

21   THE COURT:  All right.  That's all I want to stick

22   with.  Go down to the user for a minute.

23   MR. GARZA:  All right.  We're at the user.

24   THE COURT:  I understand that you're telling me

25   the user may have bandwidth restrictions.  If they've got a

1    high end system, they get the full quality.  If they've got

2    a low end system they get crappy quality.  And that YouTube

3    can supply any of those or anything in between.  Or versions

4    in between.  Right?

5              MR. GARZA:  Yes.

6              THE COURT:  But does it go to 1 through 5?  Does

7    each of those go through 1, 2, 3, 4, 5 to some kind of

8    intermediate servers out there?  That's what I can't -- it

9    sounded like there's servers and some are in Kentucky, some

10   are in Nebraska, and they're just sitting there waiting for

11   me in Oakland to pick one or the other.  That can't be the

12   way it works, but that's the image I get.

13             MR. GARZA:  That's exactly how it works.  Let me

14   explain why.

15             THE COURT:  All right.  Explain under the prior

16   art why you would have all these servers across the country

17   being tied up with one guy in California trying to look at a

18   video.

19             MR. GARZA:  Well, that second part isn't quite

20   right.  The first part where a bunch of servers across the

21   country having video clips, that part's true.  All of these

22   servers being tied up by the same user, that's not quite

23   right.  Let me explain it through.

24             So initially what happened is all of these video

25   clips would be provided to one server.  And what happens is

1      --

2              THE COURT:  Who owns that server?

3              MR. GARZA:  It can be a lot of intermediate

4      companies.  My client, CloudFlare, is a content delivery

5      network and one thing we specialize in is owning these

6      servers.  We own 120 points of presence across the world and

7      each one has tens of hundreds of servers in it.  So people

8      rent our server space so we can provide these servers to

9      people to get data from.

10             THE COURT:  And how many do you have?

11             MR. GARZA:  I get 120 locations, ten to hundreds

12     in each location depending on which location.

13             THE COURT:  So you go to YouTube for it, as an

14     example.  How many would YouTube have?

15             MR. GARZA:  I don't know about YouTube.

16             THE COURT:  Would it have as many as five?

17             MR. GARZA:  Well, YouTube is part of Google so I

18     think we're talking tons.  I assume YouTube has tons and

19     tons of servers.  More than five.

20             THE COURT:  But under the prior art someone like

21     YouTube would literally have many different servers with the

22     same information resident on it across the country?

23             MR. GARZA:  Yes.  Let me get there.

24             THE COURT:  All right.

25             MR. GARZA:  So what happens is initially, again

1    back in the day, all of these clips provide the same server.

2    What would get it to the end user was what we call a

3    manifest which is, basically, a where-do-I-go-to-get-these

4    video-clips-that-I-need.  So this manifest has different

5    URLs for each clip that says, Look, if you want to download

6    the first clip go to this URL.  And what that URL points to

7    is server five and the location of that video clip on server

8    five.  So this is the one server kind of set up for it.

9          Now, here's the problem.  If you have a popular

10   video and you were to just put that video on one server

11   across the country, you'd crash that server.  You've got

12   people in Philadelphia asking for it, Delaware, Texas,

13   California.  You have everyone converging on the same

14   server, and that's a problem.  And that's where companies

15   like our company, CloudFlare, created content delivery

16   networks.

17         The short version of what that is, is instead of

18   having one central server providing content, we host

19   thousands of servers across the world.  And when you want

20   content, you are directed to a server that is close to you.

21   That makes the content quicker.  It also makes the delivery

22   a lot more robust and more reliable because people can

23   get -- you're not dependent on one server being on to

24   provide your content.

25         If the server you're directed to fails, you can

1    kind of be switched over to a different server that doesn't

2    fail.  It's definitely a very robust system of doing it.

3           CloudFlare doesn't even -- adds a little bit more

4    to it.  A lot of content delivery networks still use URLs

5    that direct you to a specific server, so there's a lot of

6    logic in there to kind of determine what server to send each

7    user to.  CloudFlare uses something called any cast

8    addressing.

9           THE COURT:  Before the plaintiff's alleged

10   invention, did companies that -- what was this called again?

11   Adaptive what?

12          MR. GARZA:  So this first part of it where you

13   encode the video clip into multiple clips of varying

14   quality, you put that on a server and the end user, logic in

15   the end user system, makes the decision about which clip to

16   pull based on how good the bandwidth is.  That's adaptive

17   streaming.

18          THE COURT:  So that was in the prior art.

19          MR. GARZA:  Yes.

20          THE COURT:  You agree that was in the prior art?

21          MS. SPIRES:  Yes, Your Honor.

22          THE COURT:  Okay.  Now, you get to move over there

23   and I'll go back to the plaintiff.  I don't want you to

24   reveal in public anything that would be something that you

25   don't want -- because we got the press here.

1          Now, given that this much was already in the prior

2    art, what's so great about your alleged invention?

3          MS. SPIRES:  This is where it's a little difficult

4    to answer that question with members of the public here

5    because we do get into what's so great about the invention

6    is the trade secret.

7          THE COURT:  Well, can you point me to a slide then

8    that will help me understand that better?

9          MS. SPIRES:  If you look at slide 32.  I can get

10   you to what -- on the left column is what Swarmify does and

11   what CloudFlare now does.  And one particular --

12   CloudFlare's primary defense here is that they independently

13   developed this without reference to Swarmify's trade

14   secrets.  And so this slide demonstrates that that's just

15   not true and shows what CloudFlare independently developed

16   on the right side.

17          And so what CloudFlare says it independently

18   developed I can discuss if you would like me to get into

19   that part.

20          THE COURT:  Which one of the boxes is it?

21          MS. SPIRES:  The right-hand column that says

22   CloudFlare's IDF.

23          THE COURT:  Yeah?

24          MS. SPIRES:  This was publicly disclosed in the

25   pleadings.  And so that one I can talk about with members of

1        the public here.  So this can --

2                THE COURT:  All right.  So that -- talk about that

3        part for me.

4                MS. SPIRES:  So this would take us to what

5        CloudFlare says it's disclosed.  Now, first I'd like to

6        mention -- try to kind analogize this to a road map.  So

7        this manifest file, this is all telling you how to get -- if

8        you're trying to get from Florida to California, a manifest

9        file, basically, tells you how to do that saying, You're

10       going to go to this URL to get the video.

11               What the adaptive streaming does is all it focuses

12       on is trying to get you to a video that's going to stream

13       without -- without buffering.  And so that can sacrifice

14       video quality in certain instances by, up here, if you have

15       to click the lowest quality segment in order to keep the

16       video buffering because you have a low bandwidth, that's

17       what adaptive streaming is concerned with.  All it's

18       concerned with is keeping the video running by changing the

19       size of the file.

20               What CloudFlare's IDF, what it independently

21       discovered, it had an idea that said, You know what?  What

22       we're doing or what's being done is that you go to often the

23       closest server, just because that's going to be the fastest.

24       And that's the best way to keep -- at the time -- it was the

25       best way to keep a video running was to put it on the

fastest server because then you're going to have the highest

bandwidth and you want to keep the video running.  If it

doesn't then the user gets frustrated and goes somewhere

else and yours isn't viewed.

So what CloudFlare's IDF says is, You know what?

We can source the first few seconds from where it's fast,

and then when there's enough kind of lead time built up so

that hopefully the video won't buffer, we can switch to a

different server that's farther away and is going to cost us

less.

THE COURT:  All right.  That's what IDF says.

MS. SPIRES:  Yes.  That's what the IDF says.  And

it gives, basically, a paragraph about an idea of how to do

this.  But, as you might imagine, this is a fairly

complicated procedure trying to figure out how to change the

way to do this and it doesn't give any details.  It's,

basically, like saying -- taking a globe and saying, I want

to go from Florida to California and drawing a line across.

That's not actually going to tell you how to get there.

And so it discloses the general idea, but not

really any way to implement it.

THE COURT:  So let me ask a practical question

again using the prior art but using that diagram.  So I can

understand that you might have the closest one could be

faster somehow, even though we're dealing with the speed of

electricity and so forth.  Nevertheless maybe microseconds
faster.

But cheaper, I don't understand that part.  Does
-- when somebody clicks on a YouTube or any other video, I
didn't think you pay anything for it.  It's free.  So how --
what does it mean to be cheaper?  Who's paying for it?

MS. SPIRES:  The user is not paying for the video,
you're right; it is free to the user.  It's not free to the
person that is hosting the video.  And so if you're wanting
to provide video content, you've got to make a contract with
CloudFlare, someone that is one of these content network
providers that can actually host the video and source it
out.  And CloudFlare then pays other folks to do this as
well.  There are a whole host all over the world of the
network providers, the content providers, that charge based
on the amount of data that's flowing to and from their
servers.

THE COURT:  Is it like surge pricing?

MS. SPIRES:  Basically, yes.  There are a lot of
different ways that pricing is done.  CloudFlare in
particular disclosed in its blog post what it pays for is
they call it the size of the pipe.  And so they pay for the
95th percentile of the traffic.  And so anything that
exceeds this 95th percentile, or making the 95 percentile
larger increasing the size of the pipe, they're having to

1   pay more.  But if the pipe is not being fully used, then

2   they can increase the amount that's going into this pipe if

3   it's still less than 95 percent.  And that's, basically,

4   free because they've already paid for the 95 percent.  It's

5   about utilizing unused resources.

6           THE COURT:  All right.  So I take it it's okay for

7   me to read out loud the first box under Cloud --

8           MS. SPIRES:  Yes.

9           THE COURT:  -- CloudFlare's idea.  Okay.  It says,

10  Starts with a fast server, then goes to cheap server.

11          MS. SPIRES:  Right.

12          THE COURT:  So as a concept, why would that be so

13  remarkable, an invention to -- are you really -- are you

14  claiming that you have some proprietary rights on that

15  concept?

16          MS. SPIRES:  Not on that particular concept.

17  That's the first step.  So what Swarmify does has many

18  layers on top of that.  And CloudFlare is claiming here that

19  because they came up with this one concept -- and mind you

20  without any way to actually implement it but just the

21  general idea -- that they somehow did not use the trade

22  secrets that Swarmify disclosed to it in implementing the

23  system that they use now.  Which is not this.  It's many

24  layers on top of it.

25          THE COURT:  But wouldn't it all have to be done

through software?

MS. SPIRES:  It is all done through software.

THE COURT:  But you never disclosed any software to CloudFlare, right?

MS. SPIRES:  Not software, but there is -- the implementation details were disclosed.  There's a patent application that disclosed implementation details.  There were slides that disclosed them.  What happens on the customer end, there's a lot of real world customer data that's proprietary to Swarmify that shows CloudFlare that -- this idea that CloudFlare wanted to do but didn't know how to, that Swarmify did that and a lot more and was wildly successful.

And so that's something that knowing -- so one of my points going through the timeline earlier was CloudFlare says in its blog post, Video is entirely messed up.  We've had requests for seven years to do this.  And they didn't do it.  In 2015 they had this idea and yet they still didn't do it.  They tell us that they didn't even start their video development until July of 2017.  Almost two years after they had this one general idea before they even start, despite the fact that they go on and on in their brief and in their declarations about all the motivation they had to decrease the costs.  And to do this -- to figure out how to decrease the costs on their end they sat on this idea, did nothing

1    because they had no idea how to make this work.  That's

2    where Swarmify comes in.

3           Swarmify does --

4           THE COURT:  So in this packet, is there a

5    description of what you -- your side disclosed to the other

6    side that is the great secret that allowed them to start

7    with fast server then go to cheap server?

8           MS. SPIRES:  The details of how that goes on are

9    in the briefing.  It's a little more complicated than we

10   could really put on a slide.  The steps that -- beyond

11   implementation details, which are not.  Okay?  That's fairly

12   detailed for a slide.  On this slide 32 the additional, kind

13   of, ideas that Swarmify brought to the table, some of which

14   is implementation, are these next three rows on the

15   left-hand side.

16          THE COURT:  You don't want me to mention that or

17   you do want me to mention that?

18          MS. SPIRES:  I do not.  These Swarmify considers

19   to be part of its trade secrets.

20          I can explain why --

21          THE COURT:  Well, I'm willing to clear the

22   courtroom if it would help you -- here's what I want you to

23   -- would help me right now.  And if we want to clear the

24   courtroom I'll be happy to do that.

25          I would like for you to show me a specific diagram

or set of code or implementation of code, flow chart,

something that you disclosed to the other side which you can

now trace into their product. That would be useful for me

to see. And if you can do that, then I'll ask people to

leave the courtroom. If you can't do that, then there's no

point in asking them to leave.

MS. SPIRES: I can do that. Do you have a copy of

the pleadings? Or would you like me to -- I have --

THE COURT: I think my law clerk has them. I

don't have them.

MS. SPIRES: I have one hard copy of

Dr. Almeroth's declarations if that would be helpful. And

what he does --

THE COURT: Do we have that here?

MS. SPIRES: I can hand you my copy if you'd like.

THE COURT: All right. Please hand it up.

Have you inspected their system and have you

gotten discovery or inspections into their system to --

MS. SPIRES: No, Your Honor, not yet.

THE COURT: What do I look -- Almeroth. What do

you want me to look at?

MS. SPIRES: In his first declaration what he does

is -- he doesn't go into all of the trade secrets since you

might imagine in many months of conversations there are

quite a few that were disclosed. But just a basic example

1    showing a comparison between Swarmify's unpublished patent

2    application, which is part of its trade secret, and

3    CloudFlare's system as disclosed on CloudFlare's own blog

4    post.

5              And so on page -- I guess paragraph 31 --

6    Dr. Almeroth starts describing what's in the patent

7    application.

8              THE COURT:  Okay.

9              MS. SPIRES:  And then if you look starting on

10   paragraph 37, Dr. Almeroth gives a description of what's in

11   CloudFlare's blog posts.

12             THE COURT:  Yeah.

13             MS. SPIRES:  And then if you go on to paragraph 43

14   he compares the two.  And the portion that's highlighted is

15   what is redacted out of the public version.

16             THE COURT:  All right.  Just a minute.  Let me

17   read this.

18             (Pause.)

19             THE COURT:  Now look at paragraph 44?

20             MS. SPIRES:  Yes.

21             THE COURT:  You got that redacted.  But to me

22   those two sentences first, second, that is saying nothing

23   more than what you have publicly said here in court.

24             MS. SPIRES:  That's correct, Your Honor.  This was

25   filed before we had seen CloudFlare's IDF, so we were not

1    yet distinguishing -- we weren't aware that that one portion

2    was in the public domain at that point.  The rest of this is

3    not, though.

4              THE COURT:  All right.  Let me look at number 45.

5              (Pause.)

6              THE COURT:  Well, I'll just use some of these

7    words like chunks and segments.  That sounds like what was

8    described to me as part of the prior art to begin with.

9              MS. SPIRES:  That part is, yes.

10             THE COURT:  All right.  So -- okay.  Then the data

11   centers and the servers, that's also a part of the prior

12   art, right?

13             MS. SPIRES:  Yes.

14             (Pause.)

15             THE COURT:  Well, look at number 46.

16             MS. SPIRES:  Yes.

17             THE COURT:  You say specific -- this part I think

18   can be -- you see the sentence that begins:  Specifically

19   the selection of a closer high speed server, and then

20   continuing on until the colon seems to me like that is not

21   secret, right?  I can read that out loud?

22             MS. SPIRES:  I think you can read that out loud.

23             THE COURT:  Specifically the selection of a closer

24   higher speed server for an initial video segment is

25   disclosed in paragraph 005 of the patent application, colon.

1           And then there's a -- now, in reading what you

2      have there, though, I don't see where it calls out the

3      initial segment.  Where is the word "initial" or where does

4      it say that the initial segment will be from a closer higher

5      speed server?

6           MS. SPIRES:  That would be in paragraph 47.

7           THE COURT:  Okay.  Well, that's not the one that's

8      quoted.  But you agree that number 46, the one wherein it

9      does not make that distinction about initial, right?  The

10     quoted material does not call out initial video segment.

11          MS. SPIRES:  This is where for me to -- it does.

12     But for me to explain that I think we would have to clear

13     the courtroom because this is --

14          THE COURT:  I don't see the word -- I don't even

15     see the word "initial" there.

16          MS. SPIRES:  It's a patent application, so it was

17     drafted beforehand without using initial words.

18          THE COURT:  Listen, I've seen, maybe not a

19     thousand, but I know I've seen many hundreds of patent

20     applications in this job.  And I know how patent

21     applications work.  You're quoting it for a specific

22     purpose.  You say specifically.  And then but when you

23     actually read the quote, it doesn't support what you say.

24          All right.  Let's go to 47 and see if that saves

25     the day.

1          MS. SPIRES:  All right.  I would like a chance

2     after we've gone through 47 to explain why that does

3     actually map.  It's just without clearing the courtroom I

4     can't make that explanation.

5          THE COURT:  All right.  I'll give you that

6     opportunity.

7          MS. SPIRES:  Okay.  So paragraph 5 is where the

8     comparison continues.

9          THE COURT:  Even number 47 doesn't say it.  47

10    doesn't call out anything about the initial segment.

11         All right.  Okay.  Let's go to the other side for

12    a minute.  And give me your public argument then we're going

13    to clear the courtroom and I'll the let counsel have a

14    chance to say things without -- when there aren't people

15    that aren't under the protective order.  Go ahead.

16         MR. GARZA:  Well, our public argument is more an

17    argument about how they have failed to define the trade

18    secret.  And here on a preliminary injunction hearing

19    they're forced to clearly show that they have a likelihood

20    of success.

21         To do that, they're required to point to a trade

22    secret that satisfies three points.  They can prove they

23    told it to us; they can prove we used it; and they can prove

24    that it's not in the public domain.

25         Now, here's the problem as CloudFlare sees it in

1    the briefing.  There's a lot of ways to think about the

2    trade secret.  And you've kind of adverted to this in your

3    questioning.  You can think of it as a very broad idea of

4    dynamically switching between servers, for sure.  You can

5    also think of it as a very narrow implementation of code

6    that we certainly don't have and could not have implemented.

7         And this chart that you've seen on Exhibit 32 are,

8    basically, various shots at different levels of broadness

9    and narrowness that they claim that we use.  But for each of

10   these, CloudFlare can show you -- and we are prepared to do

11   so -- that they can't show all three things.  They can't

12   show either that they told us and we used it, or they can't

13   show that it's not in the public domain or we didn't come up

14   with it first.

15        THE COURT:  All right.  Is there a protective

16   order in this case yet?

17        MS. SPIRES:  Yes, there is, Your Honor.

18        THE COURT:  What?

19        MS. SPIRES:  Yes, there is, Your Honor.

20        THE COURT:  Anyone who is under the protective

21   order may stay.  And, I'm sorry, I have to excuse everyone

22   else, so --

23        Then the next portion of the transcript will be

24   under seal.

25        MS. SPIRES:  Your Honor, would you allow our

1  client to stay?  While he's not under the protective order

2  they're his company's trade secrets.

3          THE COURT:  Unless the other side is going to

4  refer to something that is secret for them.

5          MR. GARZA:  We can tell if you that happens.  We

6  think for the most part our information is publicly.  The

7  only exception is they did take a deposition from one of our

8  engineers on how our product works.

9

10          **(The balance of the proceedings placed under**

11  **seal.)**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF OFFICIAL COURT REPORTER

I, VICKI EASTVOLD, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 26th day of February, 2018.


                              s/Vicki Eastvold
                              Official Court Reporter
                              United States District Court
                              450 Golden Gate Avenue
                              16th Floor
                              San Francisco, CA    94102